## * JAMES SCHOLFIELD *versus* SHUBAEL BELL

Of stoppage *in transitu.*
[Where goods were ordered from an *English* house by a merchant here, but before the order was executed, it was countermanded, and a bill of lading of a part of the goods was subsequently sent and received by the merchant here, and part of the goods were accordingly shipped, yet on notice thereof, after the removal of the goods, the merchant here, being insolvent, refused to receive them, and endorsed the bill of lading to a friend of the *English* house for their use, and requested him to receive the goods for them, which he could not obtain, they then being under attachment by a creditor of the merchant here; held, in replevin by the *English* house, that the property had not vested in the merchant here, and might be reclaimed by them, as *in transitu.* — ED.]

THIS was an action of *replevin*, for two hogsheads of hardware The plea averred the property, when taken, to be in *William Hill*, and traversed the property in the plaintiff; and issue was joined upon the traverse.

Upon the trial of the said issue, which was had before *Parker*, C. J., at the last November term in this county, the plaintiff, to prove his property, called *William Hill* as a witness, who was sworn and examined. The articles replevied had been attached by the defendant, a deputy sheriff, as the property of said *Hill*, upon an original writ in favor of *Francis Wilby*.

The said *Hill* testified, that in the fall of 1815 he wrote to the house of *Scholfield & Co.*, in *Birmingham*, ordering a large invoice of hardware goods; and that, about twenty days afterwards, he wrote to the same house, countermanding the order. In the following spring, to his surprise, he received a bill of lading, and a letter covering that, and an invoice of the two hogsheads of hardware in question. Before this came to hand, at *Portsmouth*, in *New Hampshire*, where the witness lived and transacted his business, he received advice from the said *Wilby*, that these goods were attached at his suit. Immediately on receiving the bill of lading, &c., the

witness not knowing there was any agent of the house of *Scholfield* in this country, went to a Mr. *March*, of *Portsmouth*, who had recommended him to *Scholfield*, and requested him to receive the goods for *Scholfield*; and to enable him so to do, he endorse l the bill of lading, and delivered over the invoice, with which *March* came to *Boston*; but could not obtain the goods, because they were held by attachment, as aforesaid. The witness afterwards, having learned that a Mr. *Lyman* was the agent of the *English* house at *New York*, wrote to him on the 16th * of May, 1816, inform-  [ * 41 ] ing him of all the circumstances, and stating that he should not receive the goods. *Lyman* thereupon came on to *Boston*, and caused them to be replevied by the writ in this suit. It appeared that the house in *England* had received the countermand of the orders for goods before they were shipped; but that having procured and packed these two hogsheads, part of the quantity ordered, they concluded to send them.

It appearing to the Chief Justice, that there was no act of *Hill*, tending to vest the property in him, so as to make the goods liable to attachment for his debts, a verdict was directed for the plaintiff; and being so returned, the defendant moved for a new trial for a supposed misdirection.

*Peabody*, for the defendant. After *Hill*, the consignee, had received the bill of lading, and had exercised any act of ownership in relation to the goods in question, as he did by endorsing the bill of lading to *March*, it was too late for the consignor to stop them *in transitu*. They were, in effect, taken possession of by him; the attaching of them as his property, by a creditor of his, being equal to a voluntary assignment by him. (1)

*Davis* [Solicitor-General] and *Thurston* for the plaintiff.

PARKER, C. J., delivered the opinion of the Court. This case is stronger for the plaintiff than the common cases of stopping *in transitu*. In those cases, the property is supposed to vest in the consignee, but for the intervention of the consignor. When the goods are separated and removed from the possession of the consignor, upon a previous contract of sale, the absolute property vests in the consignee, and they are at his risk the moment they are set apart and designated. But for the convenience of trade, and the security of merchants, the consignor may, before they are actually delivered according to their destination, rescind the contract, and resume his property in the goods, in prejudice * of any [ * 42 ]

(1) 1 *H. Black.* 363, *Mason* vs. *Lickbarrow.* — 6 *East*, 20, S. C. *in notis.* — 1 *B. & P.* 563, *Haille* vs. *Smith, in error.* — 5 *Mass. Rep.* 157. — *Lane & Al.* vs. *Jackson*, 3 *P. Wil.* 185. — 3 *Caines*, 182, *Hollingsworth* vs. *Napier.* — 2 *Caines*, 30, *Hunt & Al.* vs. *Bowne.* — *Abbot on Shipping*, part 3, c. 9.

creditor of the consignee, and even against assignees in case of bankruptcy.

But in this case, no delivery ever took place, which would create a change of property. The goods ordered were not shipped, nor sent out of the store of the consignor, to be shipped. Two casks only, parcel of the invoice ordered, are made ready in pursuance of the orders of the intended consignee. Before any act of delivery or removal takes place, the consignor receives a countermand of the order to ship. Whether he was obliged to obey this or not, as he had begun to execute the first order, is not the question. He did obey it, and consented to rescind the contract, by desisting from executing the orders. He could not rescind in part, and insist upon the execution of the residue, without the consent of *Hill*, who had ordered the goods, and afterwards countermanded the order. If he would charge *Hill* upon the strength of his first order, he should at least have gone on to execute the order in full.

*Hill*, by this act of shipping the two casks to him, contrary to his desire and his order, could gain no property in the merchandise, but by some subsequent act, such as receiving the goods, or by some implied assent to the consignment to him; and until they came into his possession, actually or virtually, they remained the property of the consignor.

It has been argued that receiving the bill of lading and endorsing it is equivalent to an actual receipt of the goods; and it might be, if the consignee had received it with a view to claim the goods, or had endorsed it with a view to transfer the property to another, or to enable the endorsee to obtain possession of the goods for his account. But the evidence shows that he delivered over the bill of lading, endorsed by him, with the sole view to enable *March* to receive them for the shippers; so that this act, instead of ratifying, wholly disaffirmed the consignment to him.

[ * 43 ] When the defendant took the goods as *Hill's*, *Hill* * had no property, legal or equitable, in them; and according to the principles laid down in the case of *Lane & Al.* vs. *Jackson*, any friend of *Scholfield* might claim and receive them for him. They have been replevied by an authorized agent, and the verdict, which establishes the property in him, is well founded.

*Judgment on the verdict.*